ESTATE OF ARTHUR C. SHAFER, DECEASED, CHASE SHAFER, COEXECUTOR AND RESOR SHAFER, COEXECUTOR, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 10301–78.    Filed June 28, 1983.

---

*David Edward Gebhart*, for the petitioner.
*Eugene P. Bogner*, for the respondent.

CHABOT, *Judge*: Respondent determined a deficiency in Federal estate tax against petitioner in the amount of $56,738.33. The issue presented is whether under section 2036[1] the decedent's gross estate includes a lot, the deed to which conveyed life interests to decedent and his wife and remainder interests to his two sons.[2]

## FINDINGS OF FACT

Some of the facts have been stipulated; the stipulations and the stipulated exhibits are incorporated herein by this reference.

Petitioner's coexecutors are Arthur Chase Shafer and Robert Resor Shafer (hereinafter sometimes referred to individually as Chase and Resor, respectively), the two sons of Arthur C. Shafer (hereinafter sometimes referred to as decedent). For his entire lifetime, decedent was a resident of the State of Ohio, living in Cincinnati. Letters testamentary as petitioner's coexecutors were granted to Chase and Resor by the Probate Court of Hamilton County, Ohio.

Decedent was born on April 2, 1901, and died on April 23, 1974. He was married to Eunice C. R. (Chase Resor) Shafer

---

[1] Unless indicated otherwise, all section references are to sections of the Internal Revenue Code of 1954 as in effect as of decedent's death.

[2] In the notice of deficiency, respondent made a series of adjustments. The petition assigned error only to the issue presented in the opinion, *supra.* The other adjustments determined in the notice of deficiency are deemed conceded. Rule 34(b)(4).

Unless indicated otherwise, all Rule references are to the Tax Court Rules of Practice and Procedure.

(hereinafter sometimes referred to as Eunice) on January 29, 1929. Eunice died on July 30, 1973.

During their marriage, decedent and Eunice had two children: Chase,[3] born on October 31, 1929, and Resor, born on April 20, 1933. From 1937 until their respective deaths, decedent and Eunice resided in Cincinnati.

At some point, the maternal grandmother of Chase and Resor began giving annual birthday presents of $3,000 to each of her nine grandchildren. These presents to Chase and Resor were deposited in savings accounts; decedent or Eunice purchased shares of stock on behalf of Chase and Resor with some of these funds.

On October 11, 1938, for $600, decedent was granted a deed in fee simple to lot No. 437 at Gay Head, Dukes County, Mass. On February 14, 1974, decedent transferred lot No. 437 to Chase and Resor.

By deed executed on June 8, 1939, Charles D. Whidden and Leslie M. Flanders (hereinafter sometimes referred to as Whidden and Flanders, respectively), acting as trustees,[4] conveyed certain interests in lot No. 436 (which is adjacent to lot No. 437) to decedent, Eunice, Chase, and Resor. The consideration for lot No. 436 was $1,200. Lot No. 436 contains 6 acres, more or less, with frontage on Menemsha Pond, a saltwater arm of the sea. From the time of its acquisition, lot No. 436 has been improved with a four-bedroom, two-bath house and a pumphouse put on the property by decedent.[5] The house was used as a vacation summer house by decedent, Eunice, Chase, and Resor.

The deed to lot No. 436 states as follows:

in consideration of one dollar and other valuable considerations, paid by Eunice C. R. Shafer, Arthur C. Shafer, and Arthur Chase Shafer and Robert Resor Shafer, * * * the receipt whereof is hereby acknowledged [the trustees] do hereby grant, bargain, sell and convey unto the said Eunice C. R. Shafer, Arthur C. Shafer, and Arthur Chase Shafer and Robert Resor

---

[3]Chase is a self-employed lawyer, who also owns and operates residential real estate as rental property.

[4]These trustees were not related to the Shafers. The execution and recordation of the deed as to lot No. 436 was an arm's-length transaction between these trustees and the Shafers.

[5]Apparently, lot No. 436 was purchased because decedent had unknowingly put these improvements on lot No. 436, having intended to put them on lot No. 437.

Shafer, in accordance with the estates and interests set forth in the habendum, * * * Lot No. 436 * * *

The habendum provides as follows:

To HAVE AND To HOLD the granted premises with all the privileges and appurtenances thereto belonging to the said Eunice C. R. Shafer and Arthur C. Shafer for the term of their natural lives with remainder to Arthur Chase Shafer and Robert Resor Shafer as tenants in common, their heirs and assigns to their own use and behoof forever.

Neither decedent nor Eunice conveyed his or her respective interest in lot No. 436 to their sons.

Chase and Resor were the coexecutors of Eunice's estate; they did not include lot No. 436 in the gross estate reported in the Federal estate tax return for Eunice's estate. This tax return was examined for respondent by an estate and gift tax examiner attorney, Donald Grigsby (hereinafter referred to as Grigsby). During the examination of this tax return, an issue was raised as to whether her gross estate should include the value of lot No. 436 under section 2036, encompassed within which issue was a question as to whether she furnished consideration for the purchase of lot No. 436 so as to be a transferor. Grigsby requested documentation, canceled checks, or other indicia as to who furnished consideration for the purchase of lot No. 436. Grigsby was provided a copy of the deed to lot No. 436. Chase and Resor did not find or produce any other documentation, or any canceled checks or other indicia, at that time. Grigsby also requested that a statement or an affidavit be furnished by decedent at that time, but was told that the decedent was ill and unavailable. (Indeed, decedent died shortly thereafter.) Subsequently, Grigsby suggested that Chase and Resor prepare affidavits on this subject, but did not provide the wording to be used.

On December 19, 1974, Resor signed an affidavit stating in part as follows:

fall 1938 or early 1939, Arthur C. Shafer received letter from Leslie Flanders, executor of the estate of Walter L. Mayhew et al. stating that surveyor had wrongly surveyed, and Arthur C. Shafer had built house on property not belonging to him. Executor would sell Arthur C. Shafer south Lot No. 436 for $1200.00. Arthur C. Shafer bought lot spring of 1939.

\* \* \* \* \* \* \*

To the best of my memory, in all conversations with my father, he stated that he was the sole purchaser of this property and the houses thereon.

Chase signed an affidavit dated December 19, 1974, stating that "My father bought Lot 436 from Charles D. Whidden and Leslie M. Flanders, Trustees * * * in late spring, 1939." Chase states in the affidavit the following with regard to lots Nos. 436 and 437:

5. The question has arisen: who paid for those two lots?

My brother Resor Shafer and I have searched at length for old checks written by our mother and father, and have not found a cancelled check from either of them dating back to 1938 and 1939. It was my father's practice to throw away old cancelled checks after seven years or more, and I suspect he threw away the checks which had purchased both these lots.

Throughout my life both my mother and father referred to these lots as "belonging" to my father, Arthur C. Shafer. He dealt with them as if they were his. The shipping tags for the Hodgson House we erected had his name on them. And his initials were stamped on each piece of the Swedish log cabin we built after World War II on the other lot. My father always said that he had bought and paid for both these lots, and I never heard my mother contradict him when he said so.

Chase drafted both of these affidavits.

On the basis of all the material presented to Grigsby, primarily Chase's and Resor's affidavits, Grigsby determined that decedent had furnished the consideration for lot No. 436, and that Eunice had not furnished the consideration. From this, Grigsby concluded that the value of lot No. 436 should not be included in Eunice's gross estate.

Decedent's will, executed January 9, 1970, appointed his two daughters-in-law as the executors. By a codicil executed January 24, 1974, decedent revoked this appointment of his daughters-in-law and appointed his two sons, Chase and Resor, as the executors.

On July 21, 1975, Chase and Resor, as petitioner's executors, filed petitioner's Federal estate tax return. This tax return lists lot No. 436 (and the improvements on it) as being includable in decedent's gross estate as a transfer made by decedent on February 14, 1974, in contemplation of death. The value of lot No. 436, as so included, was listed as $130,000. This tax return does not list lot No. 437.

Grigsby was respondent's examiner for petitioner's Federal estate tax return. In a letter dated September 15, 1976, to Grigsby "Re: Estate of Arthur C. Shafer," Chase stated as follows:

You have asked me to write you explaining why my brother and I, co-executors of this estate, have not included in this taxable estate Lot No. 436 at Gay Head, Dukes County, Massachusetts.

Lot No. 437 was granted to Arthur C. Shafer (hereinafter: ACS) in fee by Harriet O. Robinson, on October 11, 1938. (Copy of this deed enclosed.) ACS transferred this lot No. 437 to my brother and myself on February 14, 1974 (copy of deed enclosed). My brother and I have, as co-executors of this estate, included the value of this Lot No. 437 in ACS's taxable estate.[6]

*     *     *     *     *     *     *

(It will amuse you to know that ACS bought Lot 437 for $600, put up a small camp on it, only to find that he had put the camp on Lot 436, which he then bought for $1200.)

*     *     *     *     *     *     *

I contend that Sec. 2036 does not apply to ACS's purchase of his life estate in Lot No. 436, since ACS did not make the transfer. Charles D. Whidden and Leslie M. Flanders, Trustees, made the transfer. I contend that a transfer under Sec. 2036 presupposes ownership of the property transferred.

I do not deny that ACS made a gift to CS and RS at the time of his purchase of Lot No. 436. To my knowledge, ACS never filed a gift tax return or an information gift return dealing with this gift of the remainder to CS and RS. Nevertheless, the value of the gift to CS and RS on June 8, 1939, must have been less than two annual exclusions at that time, and less than the lifetime exemption at that time.

The relevant value of lot No. 436 is $130,000.

Decedent furnished the entire consideration for the purchase of lot No. 436 from Whidden and Flanders in 1939.

## OPINION

Respondent contends that decedent furnished the entire consideration for the purchase of lot No. 436, that decedent thereby indirectly transferred the interests to Eunice, Chase, and Resor that were recited in the 1939 deed, and that this is sufficient to make decedent the transferor of lot No. 436 for purposes of estate tax inclusion under section 2036.

Petitioner contends that section 2036 does not apply to the situation where decedent does not ever take title to the property at issue, but takes only a life interest with others taking the remainder interest, even if decedent furnishes all of the consideration for the purchase of the property, as there

---

[6]The parties agree that (1) Chase and Resor, as petitioner's executors, intended to include lot No. 437 in the gross estate and intended not to include lot No. 436, (2) lot No. 437 is includable in the gross estate, and (3) the relevant value of lot No. 437 is $124,000.

has not been a transfer of the property in such situation. On answering brief, petitioner contends that the statements in the deed conveying lot No. 436 "conclusively establish" that decedent, Eunice, Chase, and Resor each paid consideration for the lot and that decedent was a co-purchaser, not a transferor.

We agree with respondent.

## A. Evidentiary Matters

At the trial, respondent offered into evidence Chase's affidavit, Resor's affidavit, and Chase's letter (described in the findings of fact, *supra*) for the following purposes: (1) For the truth of the matters asserted by Chase or Resor, as the case may be, in the respective documents, (2) for the truth of the matters stated in the affidavits to have been asserted by decedent, and (3) for the purpose of impeaching Chase and Resor as witnesses. Petitioner objected to admitting each of these documents on the grounds that (a) when offered for the truth of the matters asserted, each of the documents constitutes hearsay; (b) the documents are ex parte exhibits, admission of which violates Rule 143(b); and (c) the documents may not properly be used to impeach Chase and Resor.

Each of these documents was received into evidence for all the purposes for which it was offered. On answering brief, petitioner renews his objections, which we deal with as a preliminary matter.

### 1. Hearsay

Under section 7453,[7] the Federal Rules of Evidence (hereinafter sometimes referred to as Fed. R. Evid.) apply to the proceedings in the instant case. *Foster v. Commissioner*, 80 T.C. 34, 119 n. 42 (1983).

---

[7]SEC. 7453. RULES OF PRACTICE, PROCEDURE, AND EVIDENCE.

Except in the case of proceedings conducted under section 7463, the proceedings of the Tax Court and its divisions shall be conducted in accordance with such rules of practice and procedure (other than rules of evidence) as the Tax Court may prescribe and in accordance with the rules of evidence applicable in trials without a jury in the United States District Court of the District of Columbia.

Under Fed. R. Evid. 802,[8] hearsay[9] generally is not admissible evidence. But for Fed. R. Evid. 801(d)(2),[10] all three documents appear to constitute hearsay when offered for the truth of the matters asserted therein. Fed. R. Evid. 801(d)(2) provides that an admission by a party-opponent is not hearsay if one or more of several alternative conditions are satisfied.

Before the enactment of the Federal Rules of Evidence by Pub. L. 93–595, 88 Stat. 1926 (1975), the weight of authority was that an out-of-court statement made by an executor was not admissible in evidence against the executor as an admission, unless the executor made the out-of-court statement in his capacity as executor. See 4 J. Wigmore, Evidence, sec. 1076, at 154–155 (J. Chadbourn rev. 1972), to the effect that:

(2) Where the party sues in a *representative* capacity—i.e., as trustee, executor, administrator or the like—the representative is distinct from the ordinary capacity, and only admissions made in the former quality are receivable; in particular, statements made before or after incumbency are inadmissible.[6] Conversely, his admissions as executor or the like would not be receivable against him as a party in his personal capacity. [Emphasis in original.]

---

[8]

Rule 802. Hearsay Rule

Hearsay is not admissible except as provided by these rules or by other rules prescribed by the Supreme Court pursuant to statutory authority or by Act of Congress.

[9] Fed. R. Evid. 801(c) provides as follows:

Rule 801. Definitions

The following definitions apply under this article:

\*    \*    \*    \*    \*    \*    \*

(c) Hearsay.—"Hearsay" is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.

[10]

Rule 801. Definitions

The following definitions apply under this article:

\*    \*    \*    \*    \*    \*    \*

(d) Statements which are not hearsay.—A statement is not hearsay if—

\*    \*    \*    \*    \*    \*    \*

(2) Admission by party-opponent.—The statement is offered against a party and is (A) his own statement, in either his individual or a representative capacity or (B) a statement of which he has manifested his adoption or belief in its truth, or (C) a statement by a person authorized by him to make a statement concerning the subject, or (D) a statement by his agent or servant concerning a matter within the scope of his agency or employment, made during the existence of the relationship, or (E) a statement by a coconspirator of a party during the course and in furtherance of the conspiracy.

The footnote referred to in the Wigmore quotation cites a series of supporting authorities, and then makes the following observations:

> The Uniform Rules of Evidence provision is in accord with the text. Thus subdiv. (7) of Rule 63 makes admissible as against himself a statement by a person who is a party to the action in his individual or a representative capacity and if the latter, who was acting in such representative capacity in making the statement; enacted as Canal Zone Code tit. 5, §2962(7) (1963); Kan. Stat. §60–460(g) (1964); Virgin Islands Code tit. 5, §932(7) (1966).
>
> The California Evidence Code is *contra.* Thus §1220 provides: "Evidence of a statement is not made inadmissible by the hearsay rule when offered against the declarant in an action to which he is a party in either his individual or representative capacity, regardless of whether the statement was made in his individual or representative capacity."
>
> The official comment is as follows: "Section 1220 states existing law as found in subdivision 2 of Section 1870 of the Code of Civil Procedure. The rationale underlying this exception is that the party cannot object to the lack of the right to cross-examine the declarant since the party himself made the statement. Moreover, the party can cross-examine the witness who testifies to the party's statement and can explain or deny the purported admission. The statement need not be one which would be admissible if made at the hearing. See *Shields v. Oxnard Harbor Dist.*, 46 Cal. App. 2d 477, 116 P.2d 121 (1941) * * * ." Law Revision Commission Comment (Recommendation, January 1965).

The Notes of the Advisory Committee on the Federal Rules of Evidence, 28 U.S.C. app. at 576 (1976 ed.), provide the following rationale for excluding admissions from the definition of hearsay under Fed. R. Evid. 801:[11]

> (2) *Admissions.* Admissions by a party-opponent are excluded from the category of hearsay on the theory that their admissibility in evidence is the result of the adversary system rather than satisfaction of the conditions of the hearsay rule. * * * No guarantee of trustworthiness is required in the case of an admission. The freedom which admissions have enjoyed from technical demands of searching for an assurance of trustworthiness in some against-interest circumstance, and from the restrictive influences of the opinion rule and the rule requiring firsthand knowledge, when taken with the apparently prevalent satisfaction with the results, calls for generous treatment of this avenue to admissibility. [Citations omitted.]

The Advisory Committee's Notes continue by commenting more specifically:

---

[11] The Congress adopted in haec verba the relevant parts of Fed. R. Evid. 801, as described in the Notes of the Advisory Committee. See 56 F.R.D. 293.

The rule specifies five categories of statements for which the responsibility of a party is considered sufficient to justify reception in evidence against him:

(A) A party's own statement is the classic example of an admission. *If he has a representative capacity and the statement is offered against him in that capacity, no inquiry whether he was acting in the representative capacity in making the statement is required; the statement need only be relevant to represent affairs.* To the same effect in California Evidence Code §1220. Compare Uniform Rule 63(7), requiring a statement to be made in a representative capacity to be admissible against a party in a representative capacity. [Emphasis added.]

The Advisory Committee's Notes to Fed. R. Evid. 801 state that the rule "calls for generous treatment of this avenue to admissibility." One treatise describes the rule as follows:

Unlike Uniform Rule 63(7), Rule 801(d)(2)(A) imposes no requirement that in order to be offered against a party in his representative capacity the statement must have been made in his representative capacity. The fact that the statement is relevant to representative affairs is sufficient.

*     *     *     *     *     *     *

The rule makes no attempt to categorize the myriad ways in which a party or his representative may make an admission. Admissions can be made expressly or may be inferred from conduct. They may be made orally or in writing. The statement may have been made in connection with the instant case or in connection with some other completely independent litigation. All that is required is that the statements have been made by the party or his representative and that it be introduced by an adverse party as in some way relevant—usually because it is contrary to a position that he is now taking. [Footnote references omitted.]

[4 J. Weinstein & M. Berger, Weinstein's Evidence, par. 801(d)(2)(A)[01], at 801–140—801–142 (1981).]

From the foregoing, we conclude that the term "party" in Fed. R. Evid. 801(d)(2) is intended to include the executor of an estate. Cf. sec. 7482(b), Rule 60(a).

The statements in the affidavits and letter may be dealt with in two categories: (1) Direct statements by Chase and Resor,[12] and (2) statements by Chase and Resor as to statements by decedent.[13]

---

[12]Category (1) statements include: (a) Resor's statement in his Dec. 19, 1974, affidavit that lot No. 436 was bought by decedent; (b) Chase's statements in his Dec. 19, 1974, affidavit that decedent bought lot No. 436, and that decedent dealt with lot No. 436 as if it were decedent's; and (c) Chase's statements in the letter dated Sept. 15, 1976, that decedent bought lot No. 436 and that "I do not deny that ACS made a gift to CS and RS at the time of his purchase of lot No. 436."

[13]Category (2) statements include: (a) Resor's statement in his Dec. 19, 1974, affidavit that in all conversations with decedent, decedent stated that he was the sole purchaser of lot No.

A statement may constitute an admission under Fed. R. Evid. 801(d)(2)(A) even though the declarant is a party solely in his representative capacity but did not make the statement in that representative capacity. This we glean from the text of the rule itself ("in either his individual or a representative capacity"), as well as the Advisory Committee's Notes and Weinstein's Evidence, both. *supra*. Also, a statement may constitute an admission under this provision even though, when it was made, the statement was not against the declarant's interest. See *United States v. Shulman*, 624 F.2d 384, 390 (2d Cir. 1980). Compare Fed. R. Evid. 801(d)(2) with Fed. R. Evid. 804(b)(3).

We conclude that the direct statements by Chase and Resor (note 12 *supra*) are properly treated as statements by parties that are offered against Chase and Resor in the instant case in their capacities as petitioner's executors and, as such, the statements are excluded from the definition of hearsay by virtue of Fed. R. Evid. 801(d)(2)(A).

Chase's letter of September 15, 1976, appears to have been written in Chase's capacity as petitioner's executor, and so would have been admissible in evidence against Chase as an admission even under the more restrictive rules of prior law. In addition, Chase's letter is excluded from the definition of hearsay by virtue of Fed. R. Evid. 801(d)(2)(C) as "a statement by a person authorized by him [the party] to make a statement concerning the subject." See sec. 6903(a).

Chase's and Resor's statements, in their affidavits, as to statements by decedent[14] (note 13 *supra*) are similarly excluded from the definition of hearsay by virture of Fed. R. Evid.

---

436; and (b) Chase's statements in his Dec. 19, 1974, affidavit that decedent referred to lot No. 436 as belonging to decedent, and that decedent always said that he had bought and paid for lot No. 436.

Respondent offered the affidavits and letter for the truth of Chase's and Resor's statements and for the truth of what Chase and Resor stated were decedent's statements. Respondent did not indicate that the affidavits were offered for the truth of what Chase and Resor stated were Eunice's statements.

[14]Fed. R. Evid. 801(a) provides as follows:

Rule 801. Definitions

The following definitions apply under this article:

(a) Statement—A "statement" is (1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by him as an assertion.

801(d)(2)(A). However, decedent's statements, when offered for the truth of the matters he asserted, are not within the ambit of Fed. R. Evid. 801(d)(2)(A) as statements of petitioner's executors. Decedent's statements are nevertheless excluded from the definition of hearsay by virtue of Fed. R. Evid. 801(d)(2)(A) because of decedent's relationship with petitioner. *Foster v. Commissioner*, 80 T.C. at 120 n. 43.

We conclude that none of the documents constitutes hearsay when offered for the truth of the matters asserted by Chase or Resor, as the case may be, in the respective documents, nor when offered for the truth of the matters stated in the affidavits to have been asserted by decedent.

## 2. Ex Parte Affidavits

Petitioner contends that admitting the affidavits and letter violates Rule 143(b).[15] Petitioner asserts that "It has been repeatedly held, however, that this Court cannot base *any* findings of fact on such *ex parte* exhibits." (Emphasis in original.) Petitioner then cites six Board of Tax Appeals opinions in support of this position. We do not attempt a comprehensive exposition of the meaning of "ex parte" in Rule 143(b); it suffices to say that Rule 143(b) does not prohibit the introduction of admissions under Fed. R. Evid. 801(d)(2), merely because such admissions take the form of affidavits or a letter. None of the opinions of the Board of Tax Appeals cited by petitioner bears upon the use of such documents as admissions of a party. In *West Town State Bank v. Commissioner*, 32 B.T.A. 531 (1935), the affidavit there involved was received in evidence on the motion of the bank, but the Board held that the affidavit was insufficient to carry the bank's

---

[15]

RULE 143. EVIDENCE

\*      \*      \*      \*      \*      \*      \*

(b) Ex Parte Statements: Ex parte affidavits, statements in briefs, and unadmitted allegations in pleadings do not constitute evidence. As to allegations in pleadings not denied, see Rules 36(c), 37(c) and (d).

burden of proving its case under the relevant statute. In the other five cases cited by petitioner,[16] the Board stressed its concern that the evidence sought to be introduced could not be effectively tested by cross-examination.[17] See *Republic Bank & Trust Co. v. Commissioner*, 36 B.T.A. 680, 685 (1937). We note that the affiants and letter writer took the stand in the instant case and petitioner had ample opportunity to examine them as to the foundations and significance of the statements they made in the affidavits and letter. Of course, decedent was not at the trial to explain the statements attributed to him in the affidavits; that is the nature of estate tax cases. However, it is established that a decedent's prior statements may be received in evidence as admissions when offered against his or her estate. *Foster v. Commissioner, supra.*

We conclude that neither the affidavits nor the letter is rendered inadmissible by Rule 143(b).

### 3. Impeachment

Petitioner contends that Chase's and Resor's affidavits are not admissible to impeach their testimony at trial because Grigsby's behavior was improper.[18]

The testimony at trial did not indicate any impropriety in Grigsby's actions. Resor testified that he did not deal with Grigsby at all as to Eunice's estate, and that he signed an

---

[16]*Herndon v. Commissioner*, 18 B.T.A. 892 (1930); *West 80th Street Garage Co. v. Commissioner*, 12 B.T.A. 798 (1928); *Montgomery Bros. Co. v. Commissioner*, 5 B.T.A. 258 (1926); *The Daily News Publishing Co. v. Commissioner*, 4 B.T.A. 31 (1926); *Lee Sturgess, Administrator v. Commissioner*, 2 B.T.A. 69 (1925).

[17]In *West 80th Street Garage Co. v. Commissioner, supra*, the evidence in question was first presented to the Board as an attachment to a post-trial brief.

[18]At trial, petitioner contended that the affidavits and letter could not be used for impeachment purposes because they went beyond the direct examination and because the statements in the affidavits and letter are not inconsistent with testimony of Chase and Resor on direct examination. The tenor of the direct examination was to the effect that funds given to Chase and Resor by their maternal grandmother might have been used to purchase lot No. 436. The tenor of the affidavits and letter was to the effect that decedent provided all the consideration for the purchase of lot No. 436. Thus, use of the affidavits and letter does not exceed the breadth of direct examination, and appears to us to be sufficiently inconsistent therewith, to overcome these objections to the admission of these documents for impeachment purposes. See 3 J. Weinstein & M. Berger, Weinstein's Evidence, par. 607[06], at 607–74—607–75, 607–83, 607–85 (1982).

affidavit prepared by Chase. Chase testified that he did deal with Grigsby as to Eunice's estate; that Grigsby asked him for information as to the furnishing of consideration for lot No. 436; that when he could not provide any, Grigsby asked to interview decedent, which Chase was unwilling to allow because of decedent's failing health; and that Grigsby subsequently asked him to provide "affidavits which related to the purchase of the lot 436, and a little background as well, to set the scenes, make them comprehensible." Chase testified that Grigsby did not provide the wording of the affidavits. Grigsby testified that there was no arrangement or understanding that Grigsby would exclude the value of lot No. 436 from Eunice's gross estate if Chase provided him with affidavits that could form a basis for including this item in decedent's gross estate. Chase was not recalled in rebuttal to Grigsby's testimony.

We are at a loss to understand what petitioner believes to be Grigsby's improper actions, which petitioner states were "fully developed at the trial" and which are supposed to "cast grave doubts upon their [the affidavits'] legitimacy for any purpose."

We conclude that the documents are admissible to impeach Chase's and Resor's testimony.

## B. Application of Section 2036

Respondent contends that the value of lot No. 436 should be included in its entirety in decedent's gross estate under section 2036, because decedent furnished all the consideration for the purchase of the property and so decedent should be treated as having indirectly transferred lot No. 436 to Chase and Resor, while retaining a life interest for himself.

Petitioner maintains that decedent never made a transfer (within the meaning of section 2036) because the only interest decedent ever owned in lot No. 436 was the life interest he acquired in 1939. Further, petitioner maintains that Chase and Resor furnished full consideration in money or money's worth for the remainder interests they acquired in lot No. 436.

We agree with respondent.

## 1. In General

Under section 2036(a),[19] the value of property is includable in decedent's gross estate if decedent made an inter vivos "transfer" of the property and "retained" a life interest in the transferred property. If consideration is received for the transfer but the amount is inadequate, then, under section 2043(a),[20] the gross estate includes only the excess of the value of the property over the value of the consideration.

## 2. Consideration Paid

Petitioner bears the burden of proving error in respondent's determination in the notice of deficiency. *Welch v. Helvering*, 290 U.S. 111 (1933); Rule 142(a).

Petitioner attempts to satisfy this obligation, as to the question of who furnished consideration for lot No. 436 in 1939, by relying on the language of the deed ("in consideration of one dollar and other valuable considerations, paid by Eunice C. R. Shafer, Arthur C. Shafer, and Arthur Chase Shafer and Robert Resor Shafer") and the evidence that Chase and Resor had assets which could have been used to furnish the appropriate consideration.[21]

---

[19]SEC. 2036. TRANSFERS WITH RETAINED LIFE ESTATE.

(a) GENERAL RULE.—The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, under which he has retained for his life or for any period not ascertainable without reference to his death or for any period which does not in fact end before his death—

(1) the possession or enjoyment of, or the right to the income from, the property, or

(2) the right, either alone or in conjunction with any person, to designate the persons who shall possess or enjoy the property or the income therefrom.

The amendments of sec. 2036(a) by sec. 2009(a)(1) of the Tax Reform Act of 1976, Pub. L. 94–455, 90 Stat. 1893, and sec. 702(i)(2) of the Revenue Act of 1978, Pub. L. 95–600, 92 Stat. 2931, do not apply to the transfer in issue in the instant case.

[20]SEC. 2043. TRANSFERS FOR INSUFFICIENT CONSIDERATION.

(a) IN GENERAL.—If any one of the transfers, trusts, interests, rights, or powers enumerated and described in sections 2035 and 2038, inclusive, and section 2041 is made, created, exercised, or relinquished for a consideration in money or money's worth, but is not a bona fide sale for an adequate and full consideration in money or money's worth, there shall be included in the gross estate only the excess of the fair market value at the time of death of the property otherwise to be included on account of such transaction, over the value of the consideration received therefor by the decedent.

[21]Chase and Resor testified that they paid portions of the total consideration for lot No. 436. However, they acknowledged that their testimony essentially was based on their

This evidence is both scant and ambiguous. The deed does not recite that each of the grantees thereto furnished consideration in money or money's worth equal to the fair market value of the interest conveyed to that grantee (see sec. 2043(a), note 20 *supra*). The deed does not even recite that each of the grantees thereto furnished some of the consideration. The deed merely specifies that the consideration was furnished by a group, consisting of decedent, Eunice, Chase, and Resor.

Against this evidence for petitioner, there is the evidence of the admissions in the affidavits and the letter. These admissions, also ambiguous, are couched in terms that lead us toward the conclusion that decedent was the individual who provided the entire consideration for lot No. 436.

Although the matter is not free from doubt, weighing the evidence on both sides we conclude that it is more likely than not that decedent furnished the entire consideration for the 1939 acquisition of lot No. 436. As a result, we have found that decedent furnished the entire consideration for the purchase of lot No. 436 from Whidden and Flanders in 1939.

## 3. Decedent as Transferor

Neither of the parties has cited us to a case dealing with the precise issue in the instant case, nor have we found such a case. The issue is whether decedent's furnishing consideration for the purchase of the real property in issue, with a deed back conveying a life interest to him, constitutes a "transfer" of "*the* property" with a retained life interest in "*the* property" within the meaning of section 2036.

In these circumstances, we agree with petitioner that the appropriate course is to "return to first principles."

In *Helvering v. Hallock*, 309 U.S. 106 (1940), the Supreme Court dealt with section 302(c) of the Revenue Act of 1926, as amended by the Revenue Act of 1932 (predecessor of sec. 2036). The issue faced in *Hallock* was whether the transfers there involved were intended to take effect at death. Although the issue in the instant case is different, we find useful guidance in

---

conclusion that (in Resor's words) they "had no reason to question the deed," and on their understanding that they had sufficient assets in 1939 (Chase was 10 years old and Resor was 6 years old at the time) to pay for their remainder interests. This testimony has no greater weight than its acknowledged underpinnings.

the Supreme Court's general view of the statute, which is unchanged in relevant part from section 2036. The Court examined three earlier Supreme Court opinions and warned of "the snares which inevitably await an attempt to base estate tax law on the 'niceties of the art of conveyancing.'" (309 U.S. at 117.) The Court then (309 U.S. at 118) set forth the following guidance:

The importation of these distinctions and controversies from the law of property into the administration of the estate tax precludes a fair and workable tax system. Essentially the same interests, judged from the point of view of wealth, will be taxable or not, depending upon elusive and subtle casuistries which may have their historic justification but possess no relevance for tax purposes. These unwitty diversities of the law of property derive from medieval concepts as to the necessity of a continuous seisin. Distinctions which originated under a feudal economy when land dominated social relations are peculiarly irrelevant in the application of tax measures now so largely directed toward intangible wealth. [Footnote references omitted.]

More recently, in *United States v. Estate of Grace*, 395 U.S. 316, 320 (1969), the Supreme Court stated that the general purpose of section 811(c)(1)(B), I.R.C. 1939 (the more immediate predecessor of sec. 2036), "was to include in a decedent's gross estate transfers that are essentially testamentary—*i. e.*, transfers which leave the transferor a significant interest in or control over the property transferred during his lifetime. See *Commissioner* v. *Estate of Church*, 335 U.S. 632, 643–644 (1949)." In applying section 2036, the substance of the transfer in issue should guide us, not its form. See *Glaser v. United States*, 306 F.2d 57, 61 (7th Cir. 1962); *Estate of Marshall v. Commissioner*, 51 T.C. 696, 700–701 (1969).

In *Estate of Marshall v. Commissioner, supra*, Dora Marshall gave to Charles Marshall, her husband, shares of stock in a corporation. In exchange, Charles created a trust and contributed to it cash and securities in other corporations, which cash and securities had an aggregate fair market value more than that of the stock which Dora had given to Charles. Under the trust, Dora had a life estate and power of appointment in the trust assets. Even though Dora had not previously owned the trust assets, we held that Dora was to be treated as having transferred these assets and as having retained a life interest therein. This caused the value of the trust assets (more precisely, that proportion of the trust assets as to which Dora

had furnished the consideration) to be includable in her gross estate under section 2036(a).

In *Marshall*, Dora's estate argued, and we responded (51 T.C. at 701), as follows:

section 2036 does not apply because Charles, not Dora, transferred *his* property, not hers, to the trusts. But tax consequences, like many other legal and economic consequences of a transaction, attach to the real party in interest. *Estate of Grace D. Sinclaire, supra.* Nothing in section 2036 requires an empty ritual whereby the debtor, in this case Charles, would first physically transfer title to the property to the creditor, Dora, so that the latter could then convey that property to the trusts. [Emphasis in original.]

Dora's estate sought to distinguish a line of cases (51 T.C. at 702)—

on the ground that in each of them the decedent once owned or was entitled to receive the *precise* property which became the trust corpus. But the principle is not so limited. It applies with equal force where the arrangement substitutes one property for another of equal value. In *Glaser v. United States*, 306 F.2d 57 (C.A. 7, 1962), decedent and his wife conveyed a parcel of land to their daughter and her husband. As consideration for the convey-ance, the daughter and her husband conveyed land of equal value, referred to as parcel VII, to decedent and his wife for their joint lives with remainder over to one of decedent's sons. Holding parcel VII includable in decedent's gross estate, the court said (p. 61):

Looking through form to substance * * * decedent and his wife merely substituted one piece of property for another of equal value. The effect of the exchange of properties was a transfer of parcel VII * * * . The transaction, therefore, should be treated for federal tax purposes as if the transfer of parcel VII had emanated from decedent and his wife and as if they had retained joint life interests therein. * * *

[Emphasis in original.]

The substance of the transaction in the instant case is that decedent gave Whidden and Flanders $1,200. In exchange, Whidden and Flanders deeded lot No. 436. Whidden and Flanders unbundled the interests in lot No. 436 in essentially the same manner as did the daughter and her husband in *Glaser v. United States, supra,* and as did Charles in *Estate of Marshall v. Commissioner, supra.* That is, in their deed, Whidden and Flanders gave decedent a life interest and provided for the other interests as transfers to Eunice, Chase, and Resor. The facts that (1) the transfer was, in form, by Whidden and Flanders, and (2) lot No. 436 had not previously been owned by decedent, will not be allowed to cloud our

understanding of the substance of what happened. Before the transaction, decedent had assets (the assets he gave up in exchange for lot No. 436). In substance, he acquired lot No. 436, leaving his net assets, his potential estate, unchanged in value, though transmuted in form. Chase and Resor were to have lot No. 436, but their fee simple had to await the expiration of decedent's and Eunice's life interests. Accordingly, decedent made a disposition that was essentially testamentary—a disposition to which section 2036 was intended to apply. Decedent transferred property and retained a life interest. We do not require the dry formality of Whidden's and Flanders' deeding the fee simple to decedent and decedent's then deeding the appropriate interests to the appropriate grantees. In substance, that is what happened and, with the guidance of the relevant "first principles," we apply the statute accordingly.[22] See *Lehman v. Commissioner,* 109 F.2d 99, 100 (2d Cir. 1940), affg. 39 B.T.A. 17 (1939).

We conclude that decedent made a "transfer" of lot No. 436 under which he "retained" a life interest in that parcel, within the meaning of section 2036.

Petitioner makes a series of contentions as to the application of section 2036.

Firstly, petitioner contends that "Before section 2036 can apply, the Court must find that the decedent retained a life interest in the *identical property* given up by the decedent." (Emphasis in original.) If petitioner means for this rule to be applied in terms of the substance of the situation, then we agree. Decedent, having acquired lot No. 436, in substance gave away remainder interests (as well as a life interest to

---

[22]The following appears in C. Lowndes, R. Kramer & J. McCord, Federal Estate and Gift Taxes 186 (3d ed. 1974):

"A decedent may be taxed under Section 2036 in connection with a transfer nominally made by someone else where the decedent furnished the consideration for the transfer, so that in substance he was the transferor. For example, if A buys Blackacre from B and directs B to transfer the property to A for life, remainder to X, Blackacre will be taxable to A's estate, on the theory that in substance he, rather than B, transferred the property. [Footnote reference omitted.]"

Tax Management Portfolio, *Retained Life Interests,* No. 133–3d, at A-3 states as follows:

"A more difficult case would exist if A paid B $50,000 and B conveyed a life estate in a $50,000 house to A and the remainder to A's children. Section 2036 would probably apply there too. Logically it should also apply if A gave his children cash equal in value to the remainder interest and A and his children then bought the property."

Eunice) and retained a life interest in lot No. 436. If petitioner means for this rule to require a formal transfer by decedent, then we disagree. *Glaser* and *Estate of Marshall* clearly are contra. The decedent in *Glaser* gave up land in exchange for a life interest in a different parcel of land, with a remainder to that decedent's son; the decedent in *Estate of Marshall* gave up stock in one corporation in exchange for a life interest in securities in other corporations, with a remainder subject to her powers of appointment. The cases cited by petitioner do not conflict with *Glaser* and *Estate of Marshall*. The life insurance cases stressed by petitioner are particularly inapposite because of the special rules that have arisen regarding life insurance in general (see sec. 2042), the relationship of payments of premiums to ownership of policies, and the distinctions sought to be drawn between proceeds of policies and values of policies. However, since petitioner urges us to look at such cases, it may be appropriate to reflect on the Supreme Court's general guidance in a life insurance case as to the meaning of "transfer" in the estate tax laws generally, as follows (*Chase Nat. Bank v. United States*, 278 U.S. 327, 337 (1929));

But the plaintiffs say that the tax here must be deemed to be a tax on property because the beneficiaries' interests in the policies were not transferred to them from the decedent, but from the insurer, and hence there was nothing to which a transfer or privilege tax could apply. Obviously, the word "transfer" in the statute, or the privilege which may constitutionally be taxed, cannot be taken in such a restricted sense as to refer only to the passing of particular items of property directly from the decedent to the transferee. It must, we think, at least include the transfer of property procured through expenditures by the decedent with the purpose, effected at his death, of having it pass to another. Sec. 402(c) [of the Revenue Act of 1921] taxes transfers made in contemplation of death. It would not, we assume, be seriously argued that its provisions could be evaded by the purchase by a decedent from a third person of property, a savings bank book for example, and its delivery by the seller directly to the intended beneficiary on the purchaser's death, or that the measure of the tax would be the cost and not the value or proceeds at the time of death.

Secondly, petitioner asserts that the courts have uniformly rejected respondent's attempts to categorize other transactions by a decedent as "transfers" within the meaning of section 2036. None of the cases cited by petitioner involved the general type of fact pattern presented in the instant case, *Glaser*, and *Estate of Marshall*.

Thirdly, petitioner contends that it is a "manifest error" to attempt to relate the instant case to the reciprocal trust doctrine. We agree that there are no trusts in the instant case and so the reciprocal trust doctrine, as such, is not applicable to the instant case. What we have is decedent's purchase of property from an independent seller and the delivery of that property (subject to decedent's life interest) by the seller directly to the transferees. Petitioner's assertion of the limitations of this doctrine simply does not advance its case or impede respondent's case.

Fourthly, on answering brief, petitioner contends that section 2036(a) does not require inclusion of the value of lot No. 436 because decedent received adequate and full consideration in exchange for his transfer, as follows:

Is it "adequate and full" consideration to him? To some extent, the concept of consideration is a subjective one. Anything of value, which is bargained for will be deemed to be adequate and full consideration. So if Arthur C. Shafer paid $1,200.00 exclusively out of his own funds, and received therefore the right to spend summers on Martha's Vineyard for the rest of his life, he surely must be deemed to have received adequate and full consideration.

A similar contention was made in *Estate of Marshall v. Commissioner, supra.* There (51 T.C. at 703), we concluded that a decedent's retention of a life interest in the transferred property cannot be counted as consideration received for the transfer, under section 2036. We apply this rule in the instant case and conclude that decedent's life interest in lot No. 436 does not constitute consideration for his transfer.

We hold for respondent.

*Decision will be entered for the respondent.*